THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* GERARDO MERCED JIMÉNEZ, Defendant and Appellant.

No. CR-71-40.     Decided November 29, 1971.

*Hjalmar Flax* for appellant. *Gilberto Gierbolini, Solicitor General,* and *Juan E. Brunet, Assistant Solicitor General,* for The People.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

A jury found defendant-appellant guilty of the offenses of Murder in the First Degree and Violation of § 8 of the Weapons Law. The verdict was by a majority of 9 to 3 in the case of Murder and by unanimity in that of the Weapons Law. Furthermore, the court found him guilty of a violation of § 6 of said Weapons Law.

In this appeal appellant assigns as errors, (1) the refusal of the trial judge to transmit instructions on self-defense to the jury, as requested by the defense, (2) the nullity of the verdict because the evidence failed to establish all the elements of the offense of murder in the first degree, and (3) the nullity of the verdict returned by majority and not by unanimity.

The consideration of the first two errors requires an examination of the evidence. The summary of the same which was correctly made by the Solicitor General in his report, is as follows:

"The events of this case occurred on or about eleven thirty on the night of March 15, 1969, in a ward in Bayamón. José Belén Olivo Jiménez testified that on the day of the events he was in Ángel Huertas' bar accompanied by the deceased, Pablo Rivera Vázquez, and other friends. About six o'clock in the afternoon they departed from there and went to the business of a certain Virí. About seven p.m. they went to Raymond's Bar. (Tr. Ev. pp. 10–12.) When they arrived there they found several persons, among whom was defendant-appellant. (Tr. Ev. p. 14.) The witness and his companions shook hands with defendant-appellant. Then there arose an incident, since the

latter alleged that the deceased had squeezed his hand hard. (Tr. Ev. pp. 15–16.) Subsequently, the witness and his companions, among whom was the deceased, left the place and went to Green Village Bar, where they remained for about two hours. (Tr. Ev. p. 17.) The witness and his companions decided to return to their homes because it was late. On the return trip and when passing by Raymond's Bar, the witness saw that his father was in the business. For a second time they entered the same. (Tr. Ev. pp. 17–18.) The witness saw his father talking to defendant-appellant, who had a wound in his left hand, apparently caused by a bullet. (Tr. Ev. pp. 19–20.) The witness' father ordered a drink to pour it over defendant-appellant's wound, but the latter stated that it would be better if he drank it. Then there arose an argument between defendant-appellant and another person known as el Cano, who intended to assist him. Defendant-appellant stated that he did not want anybody's help and he started to utter obscene words against some persons who were present. (Tr. Ev. pp. 20–21.) The witness' father again talked with defendant-appellant and the latter calmed down. (Tr. Ev. pp. 21–23.) A short time afterwards, defendant-appellant again uttered insults, first against the witness and later on against his companions who were behind the bar. The deceased went to the bathroom and when he returned he found that the argument continued. (Tr. Ev. pp. 23–25.) Defendant-appellant continued uttering obscenities against the witness and his companions. When he repeated an offensive expression against the group, the deceased went towards him, and swung a blow at him which landed him on the floor. He proceeded to raise him and was dissuaded by the witness from continuing the fight. (Tr. Ev. pp. 26–27.) The witness succeeded in having the deceased go out of the business. At the request of the owner of the business, defendant-appellant also went out. Being outside the business and while the deceased was leaving, defendant-appellant called him and asked him why he had attacked him; and the deceased answered that it was because of the words he used to address him and his companions. After that defendant-appellant drew out a revolver which he was carrying in his waistband. The witness' father interposed himself between the deceased and defendant-appellant and at the same time told the former to go away. The deceased unbuttoned his shirt and turned his pockets inside out to show

defendant-appellant that he was not carrying any weapon whatsoever. Defendant-appellant delivered his revolver to the deceased and the latter returned it telling him that 'no, that is not my business.' (Tr. Ev. p. 31.) The deceased withdrew to go away, but defendant-appellant called him again and when the deceased approached him, the former fired a shot at him, the latter falling motionless on the pavement. (Tr. Ev. p. 32.) While the deceased was in that condition, defendant-appellant kicked him with his feet and hit him twice on his face. (Tr. Ev. p. 32.) The witness said that he tried to aid the deceased, but defendant-appellant aimed at him with his revolver. The witness' father pushed defendant-appellant and then one of the companions of the witness, named Valentín, took a piece of bamboo and started to attack defendant-appellant until the latter dropped the revolver which he had in his hands. (Tr. Ev. pp. 33–36.) The witness and other persons raised the wounded person from the ground, put him in an automobile, and took him to the hospital in Bayamón, from where he was taken in an ambulance to the Medical Center, dying on the way. (Tr. Ev. p. 40.)

"Olivo Jiménez continued reciting that on the way to the hospital in Bayamón, his companion, Valentín, who had taken the revolver away from defendant-appellant, threw it in front of the entrance of the National Cemetery. (Tr. Ev. pp. 39–40.) At the trial, the witness identified the revolver shown to him as the one which he had seen in possession of defendant-appellant (Tr. Ev. p. 38), and which was subsequently picked up from the place where it had been thrown. (Tr. Ev. p. 41.) Olivo Jiménez was extensively cross-examined and he maintained everything he had recited in the direct examination.

"Dr. Néstor Loynaz testified that he was a pathologist. He worked in the Institute of Forensic Medicine. He testified that on March 16, 1969, he performed an autopsy on the body of Pablo Rivera Vázquez. As a result of said autopsy, he found that the deceased died as a consequence of a bullet wound and that the bullet had penetrated about five inches above the navel, having maintained an almost horizontal trajectory, perforating the liver as well as the aorta. As a result of said perforation 'profuse bleeding' had occurred. (Tr. Ev. p. 53.) The witness likewise testified that in a situation like this one, the person dies within a few minutes. (Tr. Ev. pp. 51–53.) The blood analysis of the deceased showed .14% of alcohol. (Tr. Ev. p. 54.) The

physician identified the bullet he obtained from the body he examined.

"On cross-examination the witness maintained what he said in the direct examination. In his answer to a question of the defense as to whether defendant-appellant could have fired the shot from the ground while the victim was standing, he answered in the negative (Tr. Ev. p. 62).

"Eleuterio García García testified that on the day of the events while he was in Raymond's Bar, defendant-appellant passed by his side and stared at him. Right there he started to utter obscene words against him without there being any provocation whatsoever.

"Detective Luis A. Figueroa testified that Doctor Loynaz had delivered an envelope to him containing a bullet, which he took to the laboratory of the police and subsequently the chemist returned it to him and he delivered it to the office of the prosecuting attorney. (Tr. Ev. pp. 95–96.)

"On cross-examination he stated that he went to the Medical Center, according to the orders he received. There he saw the body in the emergency division. There he also saw defendant-appellant showing a wound on his left arm and lacerations on his head. In relation to the pistol he said that he went accompanied by Valentín (Pipo) and found the pistol where the latter had thrown it. (Tr. Ev. p. 97.)

"On redirect examination this witness identified the revolver, stating that it was the same one that he had found. He likewise testified that they opened the revolver and found that it contained two bullet caps. He asserted that defendant-appellant's wound was on his hand. (Tr. Ev. pp. 103–105.)

"Mr. Fermín Arraiza, attorney, José Belén Olivo (father), and Margarita Rivera Merced Jiménez, offered testimonies for the defense, the testimony of policeman Marcos López having been stipulated.

"Mr. Fermín Arraiza testified that he had taken the representation of defendant-appellant about three days after the occurrence of the events, at the request of the latter's wife. He saw defendant-appellant while the latter was in La Princesa Jail. The latter had several wounds on his head and a swollen hand with a point of perforation.

"Witness José Belén Olivo (father), at first testified that he could not remember where he had been on the day of the events during the night. Later on he said that that night he arrived at a business and on entering he saw defendant-appellant who was bleeding from a hand. He talked with the latter and later on he washed his hand with whiskey. There he continued talking and taking drinks with defendant-appellant. Subsequently, without remembering the time which had elapsed, a person came and hit defendant-appellant with his fist while he was talking with the witness. (Tr. Ev. pp. 122–123.) The person who hit defendant-appellant was Pablo Rivera Vázquez, known as Piliche. (Tr. Ev. p. 124.) The witness said that he could not remember whether, when he arrived at the business, the person who hit defendant-appellant was already there, or whether he arrived later on. He also said that he could not remember having seen his son (José Belén) there that night. (Tr. Ev. pp. 126–127.)

"On cross-examination, the witness admitted that on the night of the events he was 'quite drunk' (Tr. Ev. p. 127). He also admitted that, in general terms the day after having been drinking he forgot some of the things that had occurred while he was drinking. (Tr. Ev. pp. 128–129.) The witness incurred contradictions and subsequently limited himself to answer that he could not remember absolutely anything in relation to the subsequent incidents in the place of the occurrence. (Tr. Ev. pp. 131–140.)

"Margarita Rivera Merced Jiménez, defendant-appellant's wife, testified that on the night of the events, about half past one in the early morning, her husband was brought to her house pretty well beaten. About half an hour later the police arrived and took him to the hospital. (Tr. Ev. pp. 145–146.) She also testified that her husband was not carrying any weapon when he left her house. (Tr. Ev. p. 47.)

"The testimony that policeman Marcos López would offer to the effect that he went to defendant-appellant's residence and found him with bruises on his head, on his mouth, and on his left hand, was stipulated. (Tr. Ev. pp. 151–152.)" (Report of the Solicitor General, pp. 1–6.)

For more clarity in the determination as to whether in this case malice aforethought and "deliberation" were estab-

lished, we copy from the record that part of the testimony of the only witness who recited the events which occurred immediately before the victim received the unfortunate shot. Let us see:

"Q. Excuse me, witness, I am going to ask you a question, narrate the incident before Pablo Rivera attacked this man, before he hit this man, how is it?

A. Pablo Rivera was annoyed when he said that word he uttered.

Q. What word?

A. Of those four . . .

Q. Say the word.

JUDGE:

Of those four what did he say?

PROSECUTING ATTORNEY:

Witness, say the word. You are here to speak truth, what you heard, say what he said, that about those four what?

A. Those four poltroons who are there on the rear part, that is, Pablo, Pipo, Valentín, and myself, and my brother, who was there.

Q. Tell me, witness, how many times did this man address the group where you were?

A. When he called me gorilla, when . . .

Q. No, but, when he said those four poltroons who are there, did he refer again to you?

A. Yes, he pointed at us, he did this, those four.

Q. But how many times did he refer to you?

A. Twice.

Q. And what happened the second time?

A. Then, well, Pablo told me, 'look, Belén, I am going to call the attention to this man' and I told him 'let that man alone, forget about it, let's go', and then, well, when he came out of the bathroom, well, I forgot about it and it happened so suddenly, in a matter of . . . and then he hit him and then he plunged him behind the bar, it is something like this, he plunged him, he plunged him by the bar, by the side of the bar, by the place where the people passed to go in, he plunged him inside, he threw him to the floor and then he stood up.

Q. Who stood up?

A. Pablo Rivera, you see, you know, he stood up like this and again, like this, he grasped him by here, and then he raised the man, you see, he raised him like this and then, when he raised him like this, I came from the back and held him, and told him, 'Pablo, let that man go,' and then, well, Pablo let him go and I told him 'Pablo come, let's go,' and we took him outside.

Q. I ask you, witness, did Pablo have anything in his hands at that time?

A. No, sir, he did not have anything.

Q. With what did he hit this man?

A. He hit him with the fist.

Q. Did he not have anything in his hands?

A. No, sir.

Q. And when you took him away, when Pablo went with you, was he carrying anything in his hands?

A. Nothing, either.

Q. Continue reciting.

A. Then, the owner of the business, in view of our action, well, he said, if this is a problem, get out and then, well, we took Pablo out and I told Pablo let's go, and then Pablo said, I am going, and then, well, the gentleman in the meantime stood up, and then he took his hat, raised his hat, and passed it to me and then I passed the gentleman's hat to Ramón; Ramón did not want to take it and put it this way, on the counter of the bar.

Q. And when was it that he passed the hat there?

A. The gentleman raised the hat.

Q. And that hat. . . .?

JUDGE:

Let it be set forth that when he says gentleman, he points at defendant.

PROSECUTING ATTORNEY:

Q. Continue.

A. Then, well, we took Pablo out, and then, well, when we took Pablo out, the gentleman was already on his feet and then we took him away, and then, well, the gentleman, when Pablo is going away, calls him and tells him, 'why did you hit me,' and then, well, Pablo told him, 'I swung a blow at you because you said that those four . . . and we are none of those four, what you said there, you called us those four something and we are

none of those four something', and then, well, there was no more interchange of words, but why did you attack me, and then Pablo said, 'I again tell you, because you called us that,' and then the gentleman, . . . I am outside, at the door which is here, and then here outside I am like this, and then the gentleman when he came out, when the gentleman came out, he did this when he came out, you see, that there is a kind of . . . .

JUDGE:

What gentleman?

WITNESS:

The defendant, and then when he came out, he did this, you see, and then when he did this, you see, he had a pistol here, that is, it was . . . it had some white trims, I saw the trims and then he did this, and then when he did this I saw it here, and then I told my friend, I told him 'look, that man has a revolver' and then, well, the man . . . then my father intervened and told me, 'come, let's go,' and to Piri.

Q. When you say Piri, to whom do you refer?

A. To the deceased, to Pablo Rivera. Then, well, then, when Gerardo Merced comes out this way, then he pulled out a revolver, you see, that they had already interchanged words and then he pulled out the revolver, and then he did this towards the back, he did it like this, as if there was something, you know, on the back, that is, I know there was like a separation, something like this, and then he has it like this, and then Pirichi told him . . . he unbuttoned his shirt and told him, and told him 'look, I . . . that is not my business, I am unarmed,' and he pulled his pocket inside out and then he told him, well, but why do you tell me that, well, and then the gentleman took the revolver, he took it like this, by the barrel . . . please, can somebody come here . . . and then he took the revolver this way by the barrel, and then, and he took it and told him, 'take this,' he told Pirichi, then Pirichi, that is not. . . .

Q. What was it he gave him?

A. The revolver, with two white trims, and then Pirichi told him, 'no, that is not my business.'

JUDGE:

Q. How did they call him?

A. Piri, Pirichi. . . .

Q. Go on.

PROSECUTING ATTORNEY:

Q. Go on.

WITNESS:

A. And then he again told him, look, that is not my business, and he put the revolver again in his hand.

Q. When you say in his hand, to whom do you refer?

A. To the gentleman, to Gerardo Merced. And then, well, then, my father intervened, and then he came between the two who were more or less separated, like this, my father intervened, since he is tall, and grasped and told Piri, 'come Piri,' and he took him away, and then, they were going . . . like from here to the door, a distance more or less from here to the door, about forty feet, and then the gentleman called him, 'but Pirichi, come here,' and then when Pablo returned he had the revolver in his hand, like this, then Pablo told him, 'what is it you want,' and I tell you, then, well, the gentleman fired at him, that is, he was standing this way and he had the revolver here, and he did this, he fired at him, he did this, 'Raaa,' and he fired.

PROSECUTING ATTORNEY:

For the purpose of the record, the witness puts his hand on his waist, pointing toward the front, aiming toward the front and fired at him.

Q. Listen, and when you say he fired, what did he fire?

A. He fired a shot.

Q. Why do you know he fired a shot?

A. Well, that is, when he fired, smoke was seen and then Piri, as if it is something like if he were set loose . . . he fell right there as if it were something like a small pile and he fell on his back.

Q. And when Piri returned, that he asked, 'what do you want with me,' did Piri have anything in his hands?

A. Nothing.

Q. I ask you whether Piri spoke evil of the man, or to him?

A. No, sir, at no time.

Q. I ask you whether Piri attacked this man when this man fired the shot at him at that moment?

A. No, sir, and then he fired at him, and when he fired the shot at him, Piri was on the ground, he kicked him and then he hit him on his face twice like this, he turned his face and then my father was going to intervene, and when he was going to

278

intervene I grasped him by his right arm, I grasped him this way, the gentleman still had the pistol, and when I grasped my father, then he pushed me and then when my father intervened, well, he aimed at him, and then when he aimed at my father, and as my father has a very big belly, he was facing this way, and my father told him, 'you killed him, you killed him, that was what you wanted, you killed him,' and my father took out the 'switch', and then, during that argument, in said interchange, my father also pushed him and then he was somewhat calmed down, and then, it happened that way, and then Pipo took a piece of bamboo and gave him a blow." (Tr. Ev., first piece, pp. 26–33.)

The judge should instruct the jury on all the issues of law which, under any reasonable theory, might be involved in the deliberations, provided the evidence so warrants. *People v. Del Valle*, 91 P.R.R. 167, 173 (1964); *People v. Burgos*, 76 P.R.R. 187 (1954); *People v. Jiménez*, 78 P.R.R. 7 (1955); *People v. Tufiño Cruz*, 96 P.R.R. 219, 224 (1968).

■ In the present case there is no evidence to warrant instructions on self-defense. Defendant-appellant was not being attacked when he fired the unfortunate shot at the victim, nor was his life or personal security in imminent danger. Defendant knew that the victim was not carrying weapons on his person and that he was already leaving the place when he was called again by defendant, and when the former approached he fired the shot which deprived the victim of his life.

■ A possible reference to self-defense was made by appellant's counsel in presenting his theory to the jury. The theory of the case does not have any probative force whatsoever. *People v. Calderón Rodríguez*, 97 P.R.R. 255 (1969); *People v. Hernández Santiago*, 97 P.R.R. 509 (1969). Consequently, the refusal of the trial judge to give instructions on self-defense to the jury was correct.

The jury had under consideration sufficient evidence to return a verdict declaring defendant guilty of murder in the

first degree. Any kind of willful, deliberate, premeditated killing constitutes one of the modalities of this offense. Section 201 of the Penal Code (33 L.P.R.A. § 633). Defendant did not fire at the victim without malice, nor upon heat of passion or sudden quarrel. When defendant was attacked by Pablo Rivera Vázquez, after the former had uttered offensive words against Rivera and his friends, other persons intervened and separated them. It is not at that time that defendant fired the unfortunate shot. If it had been so, Rivera's death would have occurred as the result of a sudden quarrel and perhaps upon heat of passion. Rivera's friends led him outside the bar, advising him to go home, to which he agreed. Defendant also went out and addressing Rivera, who was already leaving, called him and asked him why he had attacked him, the latter answering that it was "because of the words you addressed to us, because of the offense you addressed to us." Defendant drew out a revolver from his waistband, and Rivera, unbuttoning his shirt and turning his pocket inside out, told him that that was not his business, that he was unarmed. Then defendant gave the revolver to Rivera, but the latter returned it to him saying "no, that is not my business." José Belén Olivo's father came between them and told Rivera, "come Piri" and took him away. When they were leaving, defendant again called Rivera and when the latter asked "what is it you want," defendant immediately fired a revolver shot and Rivera fell to the ground mortally wounded. Then defendant approached him and still on the ground he kicked him and hit him twice on his face.

■ Although not a long time elapsed between the interchange of words of defendant with Rivera and the time when the latter fell deadly wounded, the facts are sufficient to infer therefrom that defendant premeditated and deliberated on the killing of the deceased. The law does not require a definite lapse of time for the deliberation and premeditation

essential to a conviction of murder in the first degree. They may exist and be conceived at the same instance of the commission of the attack. *People* v. *Román,* 70 P.R.R. 48, 52 (1949).

". . . Deliberation is the resolution or decision to kill after giving it some consideration for said deliberation to take place. This space of time, according to the authorities, may be as rapid as mental action." *People* v. *Rosario,* 67 P.R.R. 346, 349 (1947).

The presence or absence of deliberation is a question to be decided by the jury; *People* v. *Barriera González,* 89 P.R.R. 756, 759 (1964); and in this case the jury correctly determined that Rivera's death was the result of defendant's well-planned, premeditated, and deliberate thought. Since deliberation is a subjective act of defendant, it is necessary to resort to the facts of the case in order to determine whether deliberation may be rationally inferred therefrom. *People* v. *Blanco,* 77 P.R.R. 726, 733 (1954). It is difficult to hold that the jury, upon whom it is incumbent to determine the absence or presence of deliberation, lacked basis on the facts to rationally infer that defendant killed Rivera with malice aforethought and deliberation. We must not disturb its verdict.

The question concerning the nullity of the verdict, because it was not unanimous, has already been decided against appellant. *People* v. *Rivera Ríos,* Cr-70-136, judgment of March 25, 1971.

The judgments appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Torres Rigual took no part in the decision of this case.